[Civ. Nos. 20820, 21323. Third Dist. Dec. 19, 1985.]

CHARLES JOSEPH SAGADIN,
Plaintiff, Cross-defendant and Appellant, v.
KENNETH J. RIPPER, JR., Defendant, Cross-defendant and Respondent;
CHUCK SWIFT DODGE-CHRYSLER,
Defendant, Cross-complainant and Respondent;
ROBERT W. BOAL et al.,
Defendants, Cross-complainants and Appellants.

KENNETH J. RIPPER, JR.,
Plaintiff, Cross-defendant and Respondent, v.
CHARLES JOSEPH SAGADIN,
Defendant, Cross-defendant and Appellant;
TOYOTA MOTOR SALES, U.S.A., INC., et al.,
Defendants, Cross-complainants and Respondents;
ROBERT W. BOAL et al.,
Defendants, Cross-complainants and Appellants.

**COUNSEL**

J. Ross Peabody, John D. Smith, Donahue & Callaham, Donahue, Callaham & Hill, Anthony D. Osmundson, William A. Wilson, Victoria Pynchon and Weintraub, Genshlea, Hardy, Erich & Brown for Plaintiff, Cross-defendant and Appellant and Defendant, Cross-defendant and Appellant.

Memering & DeMers, Memering, Varanini, Hurst, Crowle, & Trimble, Jerome M. Varanini, McDonald, Saeltzer, Morris & Caulfield and William O. Morris for Defendant, Cross-defendant and Respondent and Plaintiff, Cross-defendant and Respondent.

O. J. Ramsey, David A. Wallis, Ramsey, Morrison & Keddy, Theodore H. Morrison and Ramsey, Moore, Morrison & Keddy for Defendants, Cross-complainants and Appellants.

Moore, Clifford, Wolfe, Larson & Trutner, Dennis Gildea, David O. Larson, Michael R. Reynolds, Stumbos & Mason, Bronson, Bronson & McKinnon, Gary T. Walker and Elliot L. Bien for Defendants, Cross-complainants and Respondents.

OPINION

**SPARKS, J.**—In this case we add our voice to the appellate chorus descanting that the 1978 legislation eliminating social host liability for injuries resulting from the intoxication of a guest is not retroactive. Here a negligence cause of action was pursued against social hosts under Business and Professions Code section 25658, which makes it a misdemeanor to furnish alcohol to a person under 21 years of age. We hold that the 1978 legislation applies prospectively only and consequently does not immunize social hosts found civilly liable for injuries resulting from an accident occurring before the January 1, 1979, effective date of the legislation.

We further conclude that the adoption of comparative negligence in California eliminated the need for the special class exception to the bar of contributory negligence in cases of statutory violations. We hold therefore that unless the Legislature expressly states otherwise, a plaintiff's contributory fault must be apportioned even when the defendant violates a statute which was arguably intended to protect plaintiff against his own negligence. Consequently, the social hosts here were entitled to have plaintiffs' negligence apportioned under the principles of comparative negligence.

Finally, we consider and resolve issues relating to the indemnity rights of the parties.

### PROCEDURAL BACKGROUND AND FACTS

The accident in question occurred about 1:20 a.m. on October 28, 1978, in a Toyota land cruiser recently purchased by plaintiff Charles Sagadin from defendant Chuck Swift Dodge-Chrysler (Swift). According to the conflicting testimony, it was either being driven by Sagadin or plaintiff Kenneth Ripper, both of whom were in the front seats; Ripper and Sagadin both denied driving the vehicle and each claimed the other was driving. Gary Schlauch, the third plaintiff, was a passenger in the back seat. At the time of the accident Ripper and Schlauch were 19 years of age while Sagadin was 20. Both Ripper and Sagadin were legally under the influence of alcohol at the time of the crash. Ripper's blood alcohol content was .19; Sagadin's was either .13, according to the California Highway Patrol analysis, or .15, according to expert toxicologists called as witnesses by plaintiffs and the defendants Boals.

The driver had proceeded south on Park Boulevard in West Sacramento, ran a stop sign at Park's intersection with Stone Boulevard at 35 to 40 miles per hour, and turned right, or west, onto Stone. In that right turn the vehicle began a centrifugal skid to the left followed by a centrifugal skid to the right. The vehicle straightened out and headed essentially west on Stone near the end of an "S" turn maneuver when it tipped over in the street onto its right side. It had begun to roll over when its windshield area hit a tree.

Ripper sustained head injuries. Sagadin and Schlauch were rendered quadriplegic in the accident.

A week or two before the accident Bruce Boal asked his parents, Robert and Lillian Boal, if he and his friends could have a Halloween party at the Boal home on October 27, 1978. Mr. and Mrs. Boal agreed to allow the party. Some written invitations were sent, but Bruce invited the three plaintiffs orally. The invitations neither included a request that guests bring their own alcohol nor indicated that beer or other alcohol would be provided. Mrs. Boal helped with food and decorations for the party.

The party was to be held in the Boals' family room where Mr. Boal had previously installed a beer dispenser for his own use. The dispenser accommodated a 15½-gallon "keg" of beer. Bruce did not ask his father if he and his friends could use the dispenser for the party, but Mr. Boal told Bruce that if they drank any of his beer, it would have to be replaced. Before the party, Bruce had arranged for the purchase of two half kegs of Coors beer for the party from Country Maid, a nearby convenience store where Bruce and others in the group of friends had worked in the past and, in fact, where one of the group, David Hogan, was working at the time of the accident.

The party began about 7 p.m. Mr. and Mrs. Boal left the house before the party began and went to the home of some neighbors. They planned to meet their daughter and her husband there later in the evening, change into costumes of their own, and return to their home to join in the party.

Before the party began, there was a keg of Mr. Boal's beer already in his dispenser, one-third to one-half gone. The balance of this keg was consumed by the 35-50 people at the party. The first full keg was picked up at Country Maid by one of Bruce's friends, and Bruce connected it to the dispenser about 8:30 p.m. This keg was also consumed at the party. It was empty at about the time the party broke up. Bruce testified that Sagadin went to Country Maid to get the second full keg and returned with it to the Boal home after almost everyone had left the party. This second Country Maid keg was not tapped or consumed at the party.

Ripper and Sagadin denied drinking anything of an alcoholic nature before arriving at the Boals' home. Each testified that he served himself from the dispenser during the party whenever he wanted more beer. None of the Boals served beer to Ripper or Sagadin or anyone else. Neither Ripper nor Sagadin could say how much beer he drank from Mr. Boal's partial keg which was in place when the party began or how much beer he drank from the first Country Maid keg, which was installed about 8:30 p.m.

However, both Ripper and Sagadin drank some beer during the evening which did not come from either keg in the dispenser. Bruce Boal saw Sagadin and Ripper drinking a bottle of Heineken beer outside the house earlier in the evening. At one point during the party Ripper left and went to the home of Elzie Linder, another of the friends in the group, where he drank two 12-ounce bottles of Heineken provided by Linder. Sagadin also went to Linder's place and had one 12-ounce bottle of Heineken.

It appears that the party was over and everyone was gone from the Boals' by no later than 11:30 p.m. Mr. and Mrs. Boal returned to the party around 10 p.m. There was no evidence either of them was even aware of the number of vehicles parked out front. Mr. Boal had not seen the land cruiser and did not know Ripper or Sagadin was driving. In the house Mrs. Boal estimated there were about 65 people at the party. She had understood there would only be about 24 there. She asked Bruce to end the party.

After the party broke up, Ripper, Sagadin, Schlauch, and Scott Gleba left in Sagadin's land cruiser to get and drink more beer. They went to World Wines in West Sacramento where either Ripper or Gleba bought more beer. According to Ripper, they bought either two 6 packs or a case of Heineken beer in bottles; according to Gleba they bought one or two 6 packs. Gleba's testimony was uncontradicted that Ripper and Sagadin opened and began drinking beer in the land cruiser as they left World Wines. They went to a spot on the levee of the Sacramento River and continued to drink beer. The evidence showed that at least Sagadin and probably Ripper each had at least two bottles of the beer purchased at World Wines.

Plaintiffs left the river and returned to West Sacramento, where they saw Bruce Boal in his truck and John Dorris in his truck on Deerwood Street, where they all stopped in their vehicles to talk. They all decided to go to Eppie's in West Sacramento for breakfast. The three vehicles proceeded in tandem with Bruce's vehicle first, Dorris's vehicle second, and the Sagadin land cruiser last. They all proceeded south on Park and turned west on Stone. When Bruce realized something was wrong, he turned around on Stone and returned to discover the accident. As we have noted, Sagadin and Schlauch were rendered quadriplegic as a result of the accident; Ripper sustained severe brain damage and virtual blindness.

As might be expected, these events gave rise to a series of lawsuits. Ripper, Sagadin and Schlauch each filed separate suits seeking damages from numerous defendants. The first group of defendants consisted of those whose liability was predicated upon the design and condition of the vehicle. The principal defendants in this group were Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Company, Ltd. (hereafter collectively called Toy-

ota), Dancer-Fitzgerald-Sample, Toyota's advertising agency, and Swift. The second group of defendants was comprised of those whose liability was based upon the unlawful furnishing of alcohol. At trial, this group had been narrowed down by settlements to Mr. and Mrs. Boal and their son, Bruce. The third group consisted of the individual plaintiffs themselves. Ripper sued Sagadin and he countersued Ripper; Schlauch sued them both. With few exceptions, each defendant in all three cases cross-complained against all the others, seeking indemnification from each other. The three actions were consolidated for trial.

At trial, there were serious questions concerning just how much of Sagadin's and Ripper's blood alcohol content was from beer at the Boals' partial keg and how much from the Country Maid keg. Furthermore, there was dispute as to how much of the blood alcohol content was attributable to beer consumed away from the Boal residence, both before and after the party and in the interim period when Sagadin and Ripper left the party and returned.

Apart from the involvement of the alcohol, there was another issue of contributory negligence. Sagadin had been driving his land cruiser for at least a week or 10 days before the accident with knowledge it had seriously defective brakes. On two prior occasions he had been involved in minor collisions because of the bad brakes on the vehicle. Both Schlauch and Ripper were aware that the brakes were bad. In fact, Ripper had driven the vehicle with its bad brakes earlier on the evening of the accident when he left the party on one occasion shortly after it began.

Procedurally, the following facts are pertinent. Before trial, Sagadin and Ripper had settled their mutual claims against one another, and Schlauch had settled with both Ripper and Sagadin. The plaintiffs had also settled with other defendants who are not parties to this appeal. The first week of trial was taken up with intensive settlement negotiations, and as a result, immediately before the actual commencement of testimony, Schlauch settled with all of the Toyota entities, Swift, and Dancer-Fitzgerald-Sample, Inc.

Sagadin and Ripper proceeded to trial against Swift, Dancer-Fitzgerald-Sample, Inc., the Toyota entities, and the Boals. Schlauch proceeded to trial against the Boals only. Dancer-Fitzgerald-Sample, Inc., was granted a non-suit at the close of plaintiffs' evidence.

Following a complex and protracted trial, the jury rendered its verdict for all three plaintiffs. The special verdict for Sagadin was in the amount of $1,250,500 against the defendants Swift, the Toyota entities, and the Boals. The jury found that Sagadin was 60 percent at fault; Toyota was 15 percent

at fault; Swift was 15 percent at fault; and the Boals were responsible in the aggregate for 10 percent of the fault. The 10 percent attributed to the Boals was apportioned by the jury as follows: Robert, 3 percent; Lillian, 1 percent; and Bruce, 6 percent. The verdict for Ripper was for $528,000 against the same defendants, with the fault distributed 55 percent as to Ripper; 15 percent against the Toyota entities; 20 percent against Swift; and 10 percent against the Boals, apportioned between them in the same fashion as the Sagadin verdict. The jury verdict for Gary Schlauch was in the amount of $1,249,136 against all three of the Boals, Robert, Lillian and Bruce. Each of the plaintiffs made an unsuccessful motion for additur or in the alternative a new trial on the issue of damages only.

As we shall see, the trial court held that plaintiffs, being under the age of 21, were members of the protected class for whose benefit the statute prohibiting furnishing alcohol to minors had been enacted. Consequently, it ruled that plaintiffs' recoveries, as to any defendant who furnished alcohol, were not subject to any reduction by reason of their own contributory negligence arising from their consumption of alcohol. Because of this comparative fault ruling, two separate awards were necessary in the judgment. First, there was a joint and several judgment against the Boals, Swift, and Toyota for that portion of the Sagadin and Ripper verdicts for which comparative fault was applied. For the portion of the verdict where no comparative fault was applied, the Boals were held to be solely liable.

The trial court thus entered an amended judgment in favor of Charles Sagadin calculated in round figures as follows: From the $1,250,500 verdict, $750,300 (or 60 percent) was deducted for Sagadin's own negligence; then the amount of settlement, $334,913, was deducted, leaving a net amount of $165,287. Judgment for that sum was entered jointly and severally as to all defendants (the Toyota group, Swift and the Boals). In addition, judgment in the amount of $750,300 was entered solely against Bruce Boal, Robert Boal and Lillian Boal. That sum was calculated by deducting the settlement figure and joint amount of $165,287 from the verdict. In total, judgment was entered against the Boals for $915,587.

The amended judgment in favor of Ripper was calculated in a similar fashion: From the $528,000 verdict, $290,400 (or 55 percent) was deducted for Ripper's contributory negligence, leaving a balance of $237,600. Since the settlement sum of $334,913 exceeded that figure, a net judgment of zero was entered against the Toyota defendants and Swift. As to the Boals, the court entered a judgment of $193,087, calculated by deducting the amount of the settlement from the verdict. Finally, a judgment of zero dollars against all defendants was awarded to Schlauch inasmuch as his prior settlement of $1,525,173 exceeded the amount of the verdict awarded by the

jury. (See *Schlauch* v. *Hartford Accident & Indemnity Co.* (1983) 146 Cal.App.3d 926, 930, fn. 2 [194 Cal.Rptr. 658].)

Pursuant to stipulation, judgment on the cross-complaints arising from the Ripper and Sagadin actions was entered in accordance with the findings of the jury. The cross-complaints by Toyota and Swift against the Boals for the amounts paid to settle with Schlauch was later tried to the court. The court applied the same percentages of fault allocated to the defendants by the jury in the Sagadin case and entered judgment accordingly. Those judgments are considered in more detail in a later part of this opinion.

The Boals appeal, contending that the 1978 amendments retroactively barred plaintiffs' social host cause of action. They further assert that, in any event, the trial court committed instructional error on that cause of action, that plaintiffs failed to prove that they furnished alcohol, and that there was no evidence that the furnished alcohol proximately caused the accident. The Boals next contend that the trial court committed reversible error by ruling that they were not entitled to the defense of contributory negligence. Finally, the Boals make a series of attacks on the various judgments. They contend that the judgment against them indemnifying Toyota and Swift was erroneous, and that the dismissal of their cross-complaints for indemnification from Toyota in the Schlauch case and from Sagadin and Ripper in all three cases was improper.[1]

Sagadin filed a protective cross-appeal. Although claiming various errors occurred in his trial, Sagadin nevertheless represents to this court that "he would be willing to forego a new trial, and accept the amount of the judgment awarded to him."

DISCUSSION

I

SOCIAL HOST LIABILITY

In this case, the civil liability of the Boals was based on the theory that the Boals "furnished" plaintiffs Sagadin and Ripper with alcohol in violation of Business and Professions Code section 25658, subdivision (a). That statute provides: "Every person who sells, furnishes, gives, or causes to be sold, furnished, or given away, any alcoholic beverage to any person under

---

[1] Neither Toyota nor Swift filed a notice of appeal and they appear here only as respondents to the Boal appeal. The Boals did not appeal from the judgment in favor of Schlauch and he is not a party to this appeal.

the age of 21 years is guilty of a misdemeanor." Plaintiffs expressly elected not to pursue the Boals on any common law theory of liability. Plaintiffs thus relied on this statute to establish the negligence of the Boals for the injuries resulting from the accident, and the jury was so instructed.[2]

## A

### THE SURVIVAL OF THE CAUSE OF ACTION

During the 1970's, a series of cases decided by the California Supreme Court abrogated the common law rule that the sale or furnishing of intoxicating liquor was not the proximate cause of an injury resulting from its use. (See *Coulter* v. *Superior Court* (1978) 21 Cal.3d 144 [145 Cal.Rptr. 534]; *Bernhard* v. *Harrah's Club* (1976) 16 Cal.3d 313 [128 Cal.Rptr. 215, 546 P.2d 719]; *Vesely* v. *Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151].) Thus, in 1978, a social host who furnished alcoholic beverages to an obviously intoxicated person was held liable to a third party injured as the result of the intoxication of the drinker. (*Coulter,* 21 Cal.3d at pp. 147, 149-150.)

In 1978 the Legislature enacted legislation which expressly abrogated the holdings in such cases as *Vesely, Bernhard,* and *Coulter* and generally reinstated the prior judicial interpretation that the consumption and not the serving of alcoholic beverages was the proximate cause of injuries resulting from the intoxication of the drinker. (Stats. 1978, ch. 929, § 2, p. 2904.)[3]

---

[2]The jury was instructed: "Section 25658(a) of the Business and Professions Code of the State of California provides in relevant [part] as follows: No person shall sell, furnish, give away or cause to be sold, furnished or given away any alcoholic beverage to any person under the age of 21 years. If you find that defendants Robert Boal, Lillian Boal or Bruce Boal or any of them violated Business and Professions Code Section 25658(a), the statute just read to you, and thus—and that such violation was a proximate cause of injury to a plaintiff, you will find that such violation was negligence. In this case against Robert Boal, Lillian Boal or Bruce Boal or any of them, *the sole basis for establishing liability is a violation of this statute.*" (Italics added.)

[3]To accomplish this sweeping reform, the Legislature added new subdivisions to Business and Professions Code section 25602 and Civil Code section 1714. The original sections remained unchanged, but were renumbered as subdivisions (a) of each section. The sections now read:

Business and Professions Code section 25602: "[¶] (a) Every person who sells, furnishes, gives, or causes to be sold, furnished, or given away, any alcoholic beverage to any habitual or common drunkard or to any obviously intoxicated person is guilty of a misdemeanor. [¶] (b) No person who sells, furnishes, gives, or causes to be sold, furnished, or given away, any alcoholic beverage pursuant to subdivision (a) of this section shall be civilly liable to any injured person or the estate of such person for injuries inflicted on that person as a result of intoxication by the consumer of such alcoholic beverage. [¶] (c) The Legislature hereby declares that this section shall be interpreted so that the holdings in cases such as Vesely v. Sager (5 Cal.3d 153), Bernhard v. Harrah's Club (16 Cal.3d 313) and Coulter v. Superior Court (21 Cal.3d 144) be abrogated in favor of prior judicial interpretation finding

Thus, with one exception, the 1978 legislation extends a general immunity from suit to providers of alcoholic beverages. "The single statutory exception to the broad immunity created by the 1978 amendments is found in [Business and Professions Code] section 25602.1 . . . ." (*Strang* v. *Cabrol* (1984) 37 Cal.3d 720, 723 [209 Cal.Rptr. 347, 691 P.2d 1013].) That section generally provides that a licensee who furnishes alcohol to any obviously intoxicated minor may be liable for any proximately caused death or injury.[4]

Although the 1978 legislation was approved by the Governor on September 19, 1978 and filed with the Secretary of State on September 20, 1978, it was not effective until January 1, 1979. The date of the accident in ques-

---

the consumption of alcoholic beverages rather than the serving of alcoholic beverages as the proximate cause of injuries inflicted upon another by an intoxicated person." (Stats. 1978, ch. 929, § 1, p. 2903, amendments underscored.)

Civil Code section 1714: "[¶] (a) Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. The extent of liability in such cases is defined by the Title on Compensatory Relief. [¶] (b) It is the intent of the Legislature to abrogate the holdings in cases such as Vesely v. Sager (5 Cal.3d 153), Bernhard v. Harrah's Club (16 Cal.3d 313), and Coulter v. Superior Court (21 Cal.3d 144) and to reinstate the prior judicial interpretation of this section as it relates to proximate cause for injuries incurred as a result of furnishing alcoholic beverages to an intoxicated person, namely that the furnishing of alcoholic beverages is not the proximate cause of injuries resulting from intoxication, but rather the consumption of alcoholic beverages is the proximate cause of injuries inflicted upon another by an intoxicated person. [¶] (c) No social host who furnishes alcoholic beverages to any person shall be held legally accountable for damages suffered by such person, or for injury to the person or property of, or death of, any third person, resulting from the consumption of such beverages." (Stats. 1978, ch. 929, § 2, p. 2904, amendments underscored.)

Business and Professions Code section 25658 (making it a crime to sell, furnish or give away alcoholic beverages to a minor) was not amended, but, as we have noted, a new section 25602.1 was added relating to obviously intoxicated minors. It reads: "Notwithstanding subdivision (b) of Section 25602, a cause of action may be brought by or on behalf of any person who has suffered injury or death against any [licensed purveyor of alcoholic beverages] who sells, furnishes, gives or causes to be sold, furnished or given away any alcoholic beverage to any obviously intoxicated minor where the furnishing, sale or giving of such beverage to the minor is the proximate cause of the personal injury or death sustained by such person." (Stats. 1978, ch. 930, § 1, p. 2905.)

[4]Because Business and Professions Code section 25658 contains no express language of civil immunity comparable to that contained in section 25602, it was contended in *Strang* v. *Cabrol, supra,* 37 Cal.3d at page 724, that "defendants remain exposed to common law tort liability for selling alcoholic beverage to a person who, though not obviously intoxicated, is under age 21, as are licensed vendors who sell liquor to an obviously intoxicated minor pursuant to section 25602.1." Rejecting that contention, the Supreme Court held that "the sweeping civil immunity now provided by Civil Code section 1714 and section 25602 was intended to encompass the situation where alcoholic beverages are sold to a person 'under the age of 21 years' (§ 25658), except where the sale is by a licensee to a 'minor' who, at the time of sale, is 'obviously intoxicated' within the meaning of section 25602.1." (*Id.,* at p. 724.)

Hereafter all references to section 25658 are to the Business and Professions Code.

tion is October 28, 1978. ■ The issue at bench is whether Business and Professions Code section 25602 and Civil Code section 1714 apply retroactively. We conclude that they do not.

In looking at the express language of section 25602 and Civil Code section 1714, we note the obvious. Neither piece of legislation contains the word retroactive. Not unexpectedly, Sagadin contends ". . . if the legislature had intended the 1978 amendments to have retroactive effect it would have said so." (See Civ. Code, § 3.) We agree. Every appellate court which has addressed the issue has unanimously agreed that the 1978 amendments are not retroactive. (See *Clendening* v. *Shipton* (1983) 149 Cal.App.3d 191, 197 [196 Cal.Rptr. 654]; *Saatzer* v. *Smith* (1981) 122 Cal.App.3d 512, 518, fn. 2 [176 Cal.Rptr. 68]; *Fosgate* v. *Gonzales* (1980) 107 Cal.App.3d 951, 959-960 [166 Cal.Rptr. 233]; *Cable* v. *Sahara Tahoe Club* (1979) 93 Cal.App.3d 384, 398 [155 Cal.Rptr. 770]; *Sissle* v. *Stefenoni* (1979) 88 Cal.App.3d 633, 635, fn. 1 [152 Cal.Rptr. 56].) As the *Fosgate* court noted, "the 1978 enactment operates prospectively . . . . [and consequently] an existing cause of action would not be nullified by the 1978 amendments. This interpretation is in accord with the general presumption that legislative enactments are construed prospectively, unless a clear intention to the contrary exists. [¶] Relying on *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371], [defendant] argues that such a clear intention to the contrary was expressed as the Legislature stated its intent to abrogate the rule of *Vesely* and its progeny and to return to the prior law. [¶] The Legislature, however, did not express an intent that the 1978 amendments be given retroactive application. Given the extensive discussion of the amendments, as revealed by the legislative history, we think the absence of an urgency clause is significant." (*Fosgate* v. *Gonzales*, *supra*, 107 Cal.App.3d at pp. 959-960, citations omitted.)[5]

We signaled our agreement with the *Fosgate* analysis when we cited it with approval in *Perry* v. *Heavenly Valley* (1985) 163 Cal.App.3d 495 [209 Cal.Rptr. 771], our most recent decision on the retroactive application of statutory amendments. "The Legislature," we declared, "is well acquainted with the rule requiring a clear expression of retroactive intent (citation), and the fact it did not so express itself or did not make the amendment effective immediately is a significant indication it did not intend to apply the amendment retroactively. (*Fosgate* v. *Gonzales* (1980) 107 Cal.App.3d 951, 960 [166 Cal.Rptr. 233].)" (*Id.*, at pp. 500-501.) Since the facts giv-

---

[5]The *Fosgate* court also concluded that the amendments were not retroactive because "the cause of action for negligent service of alcohol is grounded in the common law rather than being solely a statutory remedy. . . . Thus, the applicable rule is that the 1978 amendments did not divest [plaintiff] of her accrued common law cause of action." (107 Cal.App.3d at pp. 960-961, citations omitted.)

ing rise to plaintiffs' cause of action for unlawfully furnishing alcohol to minors occurred prior to January 1, 1979, the 1978 amendments cannot be construed retroactively to bar their cause of action against the Boals.

B

### FAILURE TO PROVE ELEMENTS OF THE CAUSE OF ACTION

The Boals argue that the plaintiffs failed to prove section 25658 was violated. They claim that there was no showing that they "furnished" alcohol or that alcohol was furnished with the knowledge the plaintiffs would be driving. The Boals also argue there was no showing that the alcohol they made available was a proximate cause of the accident.

█ In order to violate section 25658, there must be some affirmative act of furnishing alcohol. "The word 'furnish' implies some type of affirmative action on the part of the furnisher . . . ." (*Bennett* v. *Letterly* (1977) 74 Cal.App.3d 901, 905 [141 Cal.Rptr. 682].) Among other things, it means to supply, to give, or to provide. (*Id.*, at pp. 904-905.) Consequently, allegations which do not allege that the defendant "actually furnished liquor" fail to state a cause of action for negligence under a furnishing statute. (*Coulter* v. *Superior Court, supra,* 21 Cal.3d at p. 155.) Thus allegations that the defendant apartment owners "permitted" the driver to drink or that the defendant apartment manager in some unspecified manner "aided, abetted, participated and encouraged" the driver to drink to excess are insufficient. (*Ibid.*) In support of that holding the *Coulter* court cited *Weiner* v. *Gamma Phi Chap. of Alpha Tau Omega Frat.* (1971) 258 Ore. 632 [485 P.2d 18, 22] with approval. *Weiner* in turn held that no liability arose for merely supplying the host with alcohol or providing a room where alcoholic beverages are served, even when the supplier and the proprietor had knowledge that minors would be served. Similarly, the failure of university officials to stop a campus drinking party does not constitute the affirmative act of furnishing alcohol. (*Baldwin* v. *Zoradi* (1981) 123 Cal.App.3d 275, 289-290 [176 Cal.Rptr. 809].) Nor does the mere act of contributing to a common fund for the purchase of liquor constitute furnishing where the defendant never exercised any control over the alcohol consumed by his companions. (*Bennett* v. *Letterly, supra,* 74 Cal.App.3d at pp. 904-905.) Finally, the failure to protest or to attempt to stop another from drinking in one's presence is not such an affirmative act of furnishing. (*Calrow* v. *Appliance Industries, Inc.* (1975) 49 Cal.App.3d 556, 568-569 [122 Cal.Rptr. 636].) In short, nonfeasance does not violate the statute.

█ Given the requirement of an affirmative act, it is nonetheless clear that Bruce Boal furnished the beer. Unlike the absolved defendant in *Ben-*

*nett,* Bruce not only contributed to the common fund for the purchase of the beer but directed John Dorris to pick up the first keg and Dave Hogan and one of the plaintiffs to fetch the second keg. An additional distinguishing factor is that Bruce also attached the keg, facilitating access to the beer. In *Bennett,* the defendant simply observed the others drinking from a bottle of liquor. Here, in contrast, Bruce has sufficiently participated in the stream of beer availability for it to be said he furnished the beer.

■ The liability of his parents is not so easily resolved. The facts show they assisted in preparing food and decorating for the party, provided a location with the knowledge that alcohol would be served to minors, and failed to prohibit use of their beer (remarking instead that any beer, if used, would have to be replaced). It is clear that assisting with food and decorations cannot conceivably be construed as acts of "furnishing" liquor, nor— according to *Coulter* and *Weiner*—can providing the room for the party, even with the knowledge that minors would be drinking.

This leaves the fact that beer belonging to the parents was consumed at the party. The jury had before it Mr. Boals' testimony that he told his son that if parental beer was used, it would have to be replaced. Although the inference is not compelled, the jury could reasonably have inferred this was authorization to use the beer. A permissible inference from this undisputed testimony was that Mr. Boal tacitly authorized his son to provide his beer to the plaintiffs. The jury drew that inference and we, like the Boals, are bound by it. (*Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689].) Such an authorization constitutes the requisite affirmative act as a matter of law. In order to furnish an alcoholic beverage the offender need not pour the drink; it is sufficient if, having control of the alcohol, the defendant takes some affirmative step to supply it to the drinker. By authorizing his son to supply beer to the underage partygoers, Mr. Boal's act was one of misfeasance rather than nonfeasance; his affirmative conduct created the risk. Robert Boal may then be said to have furnished beer.[6] There is no evidence, however, that Lillian Boal took any affirmative act which directly or inferentially constituted furnishing alcohol to the plaintiffs. And since family relationship alone is not sufficient to impute the negligence of her husband and son to Mrs. Boal (see Civ. Code, § 5112; *Flores* v. *Brown* (1952) 39 Cal.2d 622, 630) [248 P.2d 922], there is no competent evidence to support the judgment against her and it must fall.

---

[6]The Boals also complain that the court erroneously rejected their proposed instructions informing the jury that some affirmative conduct was required to violate the statute. Nevertheless, the court did instruct the jury that "inaction in and of itself is not sufficient . . . to violate that section or to amount to a cause, but inaction at the time of the event if preceded by some affirmative conduct of any kind at any time would be sufficient." That instruction adequately informed the jury that some affirmative conduct was required.

■ The Boals' next argument has less merit. Contrary to their claim, there is no requirement that alcohol be furnished with the knowledge that the drinker will be driving. The question in cases of concurrent causes is one of foreseeability, not knowledge. As Witkin notes, the "foreseeability test . . . has been used in the analysis of either duty or proximate cause . . . ." (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 496, p. 2762.) And since the duty of care here springs from the statute (*Vesely* v. *Sagar, supra,* 5 Cal.3d at p. 165), the question of foreseeability relates not to duty but only to proximate cause. Thus in breaching a statutory duty of care to the plaintiffs by furnishing them beer, the Boals are liable for foreseeable harm to the plaintiffs caused by that breach, however the injuries occurred. Thus, "it is settled that what is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence." (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57-58 [192 Cal.Rptr. 857, 665 P.2d 947]; citations omitted.) The crucible then is the foreseeability of harm, not the manner of the injury. "In other words, the defendant may be liable if his conduct was a 'substantial factor' in bringing about the harm, though he neither foresaw nor should have foreseen . . . the manner in which [the harm] occurred." (4 Witkin, Summary of Cal. Law, *supra,* Torts, § 629, pp. 2911-2912. See also Rest.2d Torts, § 435.) Here it was manifestly foreseeable that the inebriated plaintiffs, in some manner related to their intoxication, would cause injury to themselves and others.

The cases cited by the Boals are not controlling. It is true that in *Brockett* v. *Kitchen Boyd Motor Co.* (1972) 24 Cal.App.3d 87, 93 [100 Cal.Rptr. 752], the court stated in passing that if one violated the statute and furnished liquor to a minor "with knowledge that the minor is going to drive a vehicle on the public highways, . . . he must face the consequences." Similarly, *Paula* v. *Gagnon* (1978) 81 Cal.App.3d 680, 687 [146 Cal.Rptr. 702], does mention that a bartender must know a customer will be driving in order to be liable for a death occurring in a car accident. However, this is a bit of dictum stuck at the end of an opinion holding that the decision to drive was not so blatant an assumption of the risk as to constitute a bar to plaintiff's action. In any event, neither case is persuasive for the notion that a defendant must know or foresee the manner in which the injury occurs before his conduct can be said to be a proximate cause of that injury.

■ The Boals' final argument is that even if they breached a duty of care to the plaintiffs by violating section 25658, the plaintiffs failed to prove this was the proximate cause of the accident. Their argument is that the jury could not have determined how much beer the driver drank from which source. It is difficult to determine whether the Boals are arguing that their furnishing of beer was not a cause in fact of the accident, whether it was

not otherwise a proximate cause of it, or both. In any event, this is not a fruitful argument. It is simply a variation of the argument that only the last straw is responsible for breaking the camel's back.

At the risk of pontificating, once a duty and its breach have been established, the plaintiff must then show that the breach was a cause in fact of the injury. (4 Witkin, Summary of Cal. Law, *supra*, Torts, § 622, p. 2903; Prosser, The Law of Torts (4th ed. 1971) § 41, p. 237.) ■ Thus, "as a general rule, the imposition of liability depends upon a showing by the plaintiff that his or her injuries were caused by the act of the defendant or by an instrumentality under the defendant's control." (*Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 597 [163 Cal.Rptr. 132, 607 P.2d 924].) "Causation is a fact. A cause is something regarded as a necessary antecedent; something without which the event would not have occurred." (Prosser, *Proximate Cause in California* (1950) 38 Cal.L.Rev. 369, 375.) Causation in fact then is a rule of exclusion: if the injury would have occurred even if defendant had abstained from acting as he did, plaintiff cannot recover. (*Id.*, at pp. 377-378.) ■ In this case, the plaintiffs showed that the Boals furnished alcohol of some unspecified quantity and that plaintiffs later consumed beer from other sources. While the last beer may have been the one that resulted in a level of intoxication unsafe for driving, all the beers previously consumed were obviously equally necessary to achieve the cumulative effect. Given this evidence, it was well within the jury's province to determine that both the Boal beer and the beer from the other sources were causes in fact of the accident, a determination supported by the evidence adduced at trial.[7]

Once it has been established the defendant's conduct has been a cause in fact of the injury, there remains the question of whether it was also the proximate or legal cause. The Boals renew the claim of insufficient evidence, this time arguing that there was no evidence that the beer furnished by the Boals, as opposed to the later-consumed beer, was a proximate cause of the accident. If the Boals are arguing that the low level of blood alcohol their expert testified was attributable to their beer is insufficient to support a finding of proximate cause, they are mistaken. The jury was correctly instructed that there may be more than one negligent act which contributes concurrently as the proximate cause of an injury. (See BAJI No. 3.77 (6th ed. 1977); 4 Witkin, Summary of Cal. Law, *supra*, Torts, § 624, p. 2906.) Since reasonable minds can differ on a person's ability to drive after even a few beers, it was for the jury to determine whether the Boals' conduct

---

[7]This is not undue speculation on the part of the jury. They had evidence of the plaintiffs' blood alcohol level at the time of the accident, evidence of the quantity of beer consumed after the party, evidence of the estimated number of beers consumed at the party, and toxicologist evidence of the effect of the beers on the final blood alcohol levels.

acted with another cause to produce the injury. We cannot say as a matter of law that it did not.

If they are contending that the later consumption of alcohol is, as a matter of law, a superseding cause terminating their liability, they are again mistaken. Whether the act of a third person is a superseding cause depends in part on whether it was reasonably foreseeable. (*Powell* v. *Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 364 [212 Cal.Rptr. 395].) Ordinary human experience would anticipate that a partying group of young drinkers will continue to drink elsewhere if one source is cut off. The jury could conclude that this was within the scope of the original risk, and hence would not supersede the defendants' responsibility. We conclude that there was sufficient evidence for the jury to find that the furnishing of alcohol by the Boals was a proximate cause of the accident.

## II

### THE APPLICABILITY OF CONTRIBUTORY NEGLIGENCE

We have established that the plaintiffs' cause of action was available during the window of opportunity in 1978 and that Robert and Bruce Boal were properly held liable on it. Now we must turn to the Boals' claim they were improperly denied the benefit of the principles of comparative fault announced in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226].

Before trial, the plaintiffs moved to preclude the defense[8] of contributory negligence by the Boals. Plaintiffs based their motion on the notion that section 25658 created a special class of minors in need of protection from alcohol. This class supposedly included the plaintiffs, who therefore could not be contributorily negligent in violating a statute enacted for their benefit. The motion was held under submission for the first 10 days of trial, at which

---

[8]We use the term "defense" for the sake of convenience; we refer, of course, to the measure of the plaintiff's comparative fault, not the complete bar to a plaintiff's action. Under the landmark decision in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 829 [119 Cal.Rptr. 858, 532 P.2d 1226], "in all actions for negligence resulting in injury to person or property, the contributory negligence of the person injured in person or property shall not bar recovery but the damages awarded shall be diminished in proportion to the amount of negligence attributable to the person recovering." It has been noted that contributory negligence is an unfortunate phrase because, unlike other forms of negligence, it does not involve any duty and that "contributory fault" would be a more descriptive term. (Prosser & Keeton, Torts (5th ed. 1984) § 65, p. 453.) Nevertheless, its usage is deeply ingrained in the law and thus persists. Contributory negligence has been defined as "conduct on the part of plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause cooperating with the negligence of the defendant in bringing about the plaintiff's harm." (Rest.2d Torts, § 463.)

time it was granted. After the presentation of evidence was completed and before the jury was instructed, the Boals were tendered a stipulation which would have allowed them to argue, and the court to instruct, on the contributory negligence of only one plaintiff, Schlauch, the back seat passenger. Since they had presented no evidence to support such argument, the Boals not unexpectedly declined the stipulation. The court then instructed the jury that "the defense of contributory negligence . . . cannot be asserted against plaintiffs, or any of them, by defendants ROBERT BOAL, LILLIAN BOAL or BRUCE BOAL as a matter of law." The contributory negligence of the plaintiffs was, however, tendered to the jury under proper instructions in the Sagadin and Ripper suits against Toyota and Swift, and the jury made findings of comparative fault for those verdicts.

The Boals contend that the statute in question was not intended to create a special class of minors in need of protection against their consumption of alcohol. Consequently, they argue, the court erred in ruling as a matter of law that plaintiffs' contributory negligence could not reduce their recovery under the principles of comparative negligence. ■ They further contend that, in any event, the development of the doctrine of comparative negligence has subsumed the now obsolete rule that the contributory negligence of a special class[9] of plaintiffs cannot be compared in cases involving violation of a statute. We are persuaded that the last contention is meritorious.

The parties before us differ as to whether section 25658 was intended to protect minors or the public at large, whether section 25658 is sufficiently parallel to the statute governing the delivery of alcohol to obviously intoxicated persons to be analogous, whether the 1978 amendments are relevant (and which argument they support), and which of conflicting out-of-state decisions interpreting the effect of plaintiff violations of statutes we are to follow.[10] More fruitful, we think, is the Boals' invocation to reexamine the purpose of the "special class" doctrine in light of the principles of comparative negligence.

---

[9]By special class we mean the class established by a statute construed as intended to place the entire responsibility for the risk upon the defendant in order to protect an exceptional group from their own negligence. As we recount, all negligence predicated upon a statutory violation involves by definition "the class of persons for whose protection the statute, ordinance, or regulation was adopted." (Evid. Code, § 669.) But not all members belong to such a special class, for that depends upon whether the statute was designed to shift the entire responsibility to the defendant or whether it was merely intended to protect the ordinary class by raising a presumption of negligence.

[10]The quest for out-of-state precedent is an effort of "little profit" because the California system of comparative negligence is a judicial creation shaped from our case law. Consequently, the effect of different jurisdictions' comparative negligence statutes on the doctrine of contributory negligence in the violation of statutes different from the one at bench "shed[s] little light." (*Sorensen* v. *Allred* (1980) 112 Cal.App.3d 717, 725 [169 Cal.Rptr. 441, 10 A.L.R.4th 937].)

In the course of our examination, we shall review the relationship between negligence and the violation of a statute. We then inspect the development of a "special class" exception to the bar of contributory negligence. Finally, we consider the continued vitality of that exception in light of the judicial adoption of comparative negligence.

As we have recounted, the claimed negligence of the Boals was predicated solely upon the violation of section 25658, a penal statute. As Prosser noted nearly 40 years ago, "[t]here has been much discussion of the theoretical problem of why the violation of a purely criminal statute which says nothing about tort liability should ever give rise to it. The reason usually given by the courts is that the legislature intended to provide such liability, or that such an intent is to be 'presumed.' Ordinarily this is the barest fiction, since the obvious conclusion to be drawn from the silence of the statute as to any civil remedy is that the legislators intended not to provide it, or at least that they did not have the question in mind and had no intentions at all." (Prosser, *Contributory Negligence as Defense to Violation of Statute* (1948) 32 Minn. L.Rev. 105, 107, fn. omitted. See also Leonard, *The Application of Criminal Legislation to Negligence Cases: A Reexamination* (1983) 23 Santa Clara L.Rev. 427.) Prosser found that "the most tenable explanation is that the court finds in the statute an expression of a policy for the protection of a particular class of people against the forbidden conduct, and that in furtherance of that policy it is proceeding by a species of judicial legislation well grounded in precedent, to afford an additional remedy of its own." (Prosser, *op. cit. supra*, at p. 108.) Before the enactment of the Evidence Code, the California Supreme Court confirmed that explanation when it noted that "[t]he significance of the statute in a civil suit for negligence lies in its formulation of a standard of conduct that the court adopts in the determination of such liability. The decision as to what the civil standard should be still rests with the court, and the standard formulated by a legislative body in a police regulation or criminal statute becomes the standard to determine civil liability only because the court accepts it. . . . When a legislative body has generalized a standard from the experience of the community and prohibits conduct that is likely to cause harm, the court accepts the formulated standards and applies them, except where they would serve to impose liability without fault." (*Clinkscales* v. *Carver* (1943) 22 Cal.2d 72, 75 [136 P.2d 777], citations omitted; see also Traynor, *Statutes Revolving in Common-Law Orbits* (1968) 43 State Bar J. 509.)

But not every violation of a statute gave rise to a common law presumption of negligence. In order to recover on a theory of negligence plaintiff also had to prove he was one of the class of persons for whose benefit the statute was enacted, the accident was of the nature which the statute was

designed to prevent, and the violation was the proximate cause of the injury. (*Nunneley* v. *Edgar Hotel* (1950) 36 Cal.2d 493, 497 [225 P.2d 497].)

Once such a statutory standard had been invoked as a test for civil liability, the next question was whether the violation constituted mere evidence of negligence, engendered a rebuttable presumption of negligence or established negligence per se. The California Supreme Court adopted the view that the violation of a statute raised a rebuttable presumption of negligence which could be overcome by evidence of justification or excuse. (*Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 621 [327 P.2d 897].) In determining whether a defendant has overcome this rebuttable presumption, the correct test was declared to be whether the offender "did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." (*Id.*, at p. 624.)

This common law presumption of negligence was codified with the enactment of the Evidence Code. (See Cal. Law Revision Com. com. to Evid. Code, § 669, 29B West's Ann. Evid. Code (1966 ed.) (1985 pocket supp.) p. 155; Deering's Ann. Evid. Code § 669 (1986 pocket supp.) p. 71.) Evidence Code section 669, subdivision (a) provides: "The failure of a person to exercise due care is presumed if: (1) He violated a statute, ordinance, or regulation of a public entity; (2) The violation proximately caused death or injury to person or property; (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." This statutory presumption is, by its own terms, a rebuttable one. "This presumption may be rebutted by proof that: (1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; or (2) The person violating the statute, ordinance, or regulation was a child and exercised the degree of care ordinarily exercised by persons of his maturity, intelligence, and capacity under similar circumstances, but the presumption may not be rebutted by such proof if the violation occurred in the course of an activity normally engaged in only by adults and requiring adult qualifications." (Evid. Code, § 669, subd. (b).) As the commentary to that section notes, once "it is established that a person violated a statute under the conditions specified in subdivision (a), the opponent of the presumption is required to prove to the trier of fact that it is more probable than not that the violation of the statute was reasonable and justifiable under the circumstances. . . . Since the ultimate question is whether the opponent of the presumption was negligent rather than whether he violated the statute, proof of justification or excuse under subdivision (b) negates the existence

of negligence instead of merely establishing an excuse for negligent conduct. Therefore, if the presumption is rebutted by proof of justification or excuse under subdivision (b), the trier of fact is required to find that the violation of the statute was not negligent." (Cal. Law Revision Com. com. to Evid. Code, § 669, 29B West's Ann. Evid. Code (1966 ed.) (1985 pocket supp.) p. 155; Deering's Ann. Evid. Code § 669 (1986 pocket supp.) p. 71.)

We turn now to contributory negligence and the special class exception. Prior to the adoption of comparative negligence, the contributory negligence of the plaintiff, with only a few exceptions, barred his recovery against a negligent defendant. "This rule," the *Li* court noted, "rooted in the long standing principle that one should not recover from another for damages brought upon oneself, has been the law of this state from its beginning." (*Li v. Yellow Cab Co., supra,* 13 Cal.3d at p. 810, citation omitted.) As Prosser noted elsewhere, "[i]n only three respects have the rigors of the ordinary rule of contributory negligence been modified at common law." (Prosser, Selected Topics on the Law of Torts (1953) Comparative Negligence, p. 8.) The first exception was where defendant's conduct is so aggravated that it could be characterized as wilful, wanton or reckless. The second exception "eliminates the defense of contributory negligence where the action is founded upon the defendant's violation of a statute . . . which is construed as intended to place the entire responsibility upon the defendant, and to protect the plaintiff even against the consequences of his own fault." (*Id.,* at p. 9, fn. omitted.) The third exception was the doctrine of last clear chance. (*Id.,* at pp. 10-11.) It is the second exception which concerns us. Typical of the exceptional statutes which created a special class are child labor laws. "These are found to be intended to place all responsibility upon the employer, so that he is liable for injury to the child even though he has acted in good faith and has employed the infant in ignorance of his age. To this extent they impose strict or absolute liability." (32 Minn.L.Rev., *supra,* at p. 119, fns. omitted.)

Under the former "all-or-nothing" system of contributory negligence, the "special class" exception was applied in this fashion: A court dealing with a defendant who had violated a statutory duty was to consider the legislative purpose it found in the statute; if the court found the statute merely established a standard of ordinary care, the contributory negligence of a plaintiff with respect to the risk with which the statute was concerned was a complete bar. This was the same result as if both parties had demonstrated common law negligence. However, if the statute was intended to place the entire responsibility for the risk upon the defendant in order to protect potential plaintiffs from their own negligence, contributory negligence was not available as a defense because barring the plaintiff's action would thwart the

purpose of the statute. (Prosser & Keeton, *supra*, § 65 at pp. 461-462; see also Rest.2d Torts, § 483.)

Thus a series of California cases held that plaintiff's contributory negligence was a bar in injury actions based on defendant's violation of safety statutes or orders, presumably because the statutes only established a standard of ordinary care and were not intended to place the entire responsibility upon the defendant. (See e.g., *Mason v. Case* (1963) 220 Cal.App.2d 170 [33 Cal.Rptr. 710]; *Maia v. Security Lumber & Concrete Co.* (1958) 160 Cal.App.2d 16 [324 P.2d 657]; *Mula v. Meyer* (1955) 132 Cal.App.2d 279 [282 Cal.Rptr. 107].) Child labor laws, on the other hand, have customarily been construed as intended to protect children from their own predictable carelessness and hence to place the entire responsibility upon the statutory violator. Thus in *Boyles v. Hamilton* (1965) 235 Cal.App.2d 492 [45 Cal.Rptr. 399], the court held that the contributory negligence of a child did not bar recovery for injuries caused by the violation of a safety statute designed to protect children.[11]

The rub, of course, was in determining whether the effect of the statute at issue was to place the entire responsibility upon the defendant. Courts have not provided precise principles for determining whether a statute has this effect, and the cases display "surprising diversity." (Schwartz, Comparative Negligence (1974) § 6.2 at pp. 119, 120.) Part of the reason for that diversity, as we have noted, is that the legislature frequently does not have the question of tort liability in mind when enacting criminal statutes, much less whether that liability should be shared according to fault or borne only by the violator.[12]

---

[11]Prior to the 1971 decision in *Vesely,* California courts did not have occasion to consider whether a statute prohibiting the delivery of alcohol to minors was intended to shift the responsibility to the offending defendant because the consumption, and not the furnishing, of alcohol was deemed to be the proximate cause of injury from its use. (See *Cole v. Rush* (1955) 45 Cal.2d 345, 356 [289 P.2d 450], overruled in *Vesely v. Sager, supra,* 5 Cal.3d at p. 167.)

[12]This case illustrates the chimerical quest for such an unexpressed legislative intent. The Boals cite the 1978 amendments as illustrative of the Legislature's earlier intent and further argue that the alcoholic beverage statutes were adopted for the purpose of protecting members of the general public, and not the drinker, from injuries arising from the excessive use of alcohol. Indeed, the *Vesely* court held that one of the purposes of the statute prohibiting sale of alcohol to obviously intoxicated persons was to "protect the safety of the people of this state." (*Id.,* at p. 165.) The court found support for this interpretation "in the decisions of those jurisdictions in which similar statutes, and statutes prohibiting the sale of alcoholic beverages to minors, have been found to have been enacted for the purpose of protecting members of the general public against injuries resulting from intoxication." (*Ibid.,* citations omitted.) On the other hand, plaintiffs rely upon the language in *Brockett v. Kitchen Boyd Motor Co., supra,* 24 Cal.App.3d at page 94, that "Section 25658 is directed to a special class; it pertains to young people who because of their tender years and inexperience are unable to cope with the imbibing of alcoholic beverages." Yet subdivision (b) of that same

It was against this background that the California Supreme Court adopted "the so-called 'pure' form of comparative negligence, [which] apportions liability in direct proportion to fault in all cases." (*Li, supra,* 13 Cal.3d at p. 827.) Under that system plaintiff's contributory negligence, even if it exceeds the amount of the comparative fault of the defendant, reduces but does not prevent his recovery. (*Ibid.*) The question here is what effect, if any, the adoption of comparative negligence had on rules governing contributory negligence in cases of violation of a statute designed to protect a special class. A leading commentator has concluded that "under comparative negligence, unless the legislature specifically states to the contrary, plaintiff's fault should be considered even though defendant has violated a safety statute designed to protect plaintiff from his own inadvertence. . . . There may be some justification to retain the rule that plaintiff's negligence should not be considered when defendant has violated a statute specifically designed to protect plaintiff against his own negligence; nevertheless, the great difficulty courts and the Restatement of Torts itself found in enunciating methods whereby such statutes could be identified, suggests that the rule be abolished. [¶] The rule barring contributory negligence was not directly sponsored by courts' dislike of the contributory negligence defense; nevertheless, it arose in an atmosphere where plaintiff was placed in an all or nothing recovery situation. Under comparative negligence, it would seem proper for a jury apportioning fault to consider the fact that defendant violated a statute that was designed to protect plaintiff against his own inadvertence. The jury should be permitted to make some apportionment, giving due regard to the gravity of the defendant's offense and to the total circumstances, if it finds that plaintiff was at fault with respect to the cause of his own injuries. If the matter is approached in this way, it can be anticipated that mitigation of damages, if any, will be very slight." (Schwartz, Comparative Negligence, *supra,* § 6.2, pp. 124-125.) We agree that this is the better rule and adopt it.

First of all, such a rule is in keeping with the broad pronouncements of the Supreme Court that "a comprehensive system of comparative negligence should allow for the apportionment of damages in *all* cases involving misconduct which falls short of being intentional" and that "the *fundamental* purpose of [comparative negligence] shall be to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties." (*Li, supra,* 13 Cal.3d at pp. 826, 829; italics added.)

---

section makes the minor himself guilty of a misdemeanor for purchasing alcohol, which evidences a penal rather than protective intent behind the statute. Indeed, the plaintiffs would be hard-pressed to find another of these "special class" statutes which both protects and penalizes the class in the same breath. In short, whether section 25658 was enacted for the sole benefit and protection of minors with the intent to put the sole responsibility for its violation on the defendant is inherently problematical.

Such a rule is also consonant with the Evidence Code provision imposing a presumption of negligence for violation of a statute. If an offender may show that his violation of a statute was excused, even though the "injury resulted from an occurrence of the nature which the statute . . . was designed to prevent" and even though plaintiff "was one of the class of persons for whose protection the statute . . . was adopted" (Evid. Code, § 669), we can discern no reason why plaintiff's comparative fault should not also be assessed. If the defendant's exercise of ordinary care can defeat the presumption which arises from his violation of the statute, there is no rational reason why the plaintiff's failure to exercise care for his own safety should not conversely diminish his recovery. The issue for both sides is the exercise of reasonable care; what's care for the defendant goose ought to be care for the plaintiff gander.

Indeed, since comparative negligence applies to cases of strict liability (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162]), we are hard pressed to explain why it should not also apply to all cases of statutory violations. After all, strict liability is imposed to shift the burden of loss from injured persons who are powerless to protect themselves. (*Id.*, at p. 736.) The same rationale was employed in developing the special class exception to statutory violation cases. As we have noted, the former rule in California and present rule under the Restatement of Torts Second is that "plaintiff's contributory negligence bars his recovery for the negligence of the defendant consisting of the violation of a statute . . . ." (Rest.2d Torts, § 483.) The only exception to the rule was when "the effect of the statute is to place the entire responsibility for such harm as has occurred upon the defendant." (*Ibid.*) Surely no one could seriously argue that the bar of this former rule survived the adoption of comparative negligence in California. By the same token, there is no compelling reason why an exception to the rule ought to survive when the rule itself has been abrogated. As enshrined in a maxim of jurisprudence, "[w]hen the reason for a rule ceases, so should the rule itself." (Civ. Code, § 3510.) A corollary to that maxim is that when the rule falls, so should its exceptions.

We also draw solid support by analogy to the cases which abolished the doctrine that willful misconduct by a defendant precluded the defense of contributory negligence as a bar; once the latter was abrogated by comparative negligence, there was no further need for the former. (*Zavala* v. *Regents of University of California* (1981) 125 Cal.App.3d 646, 650-651 [178 Cal.Rptr. 185]; *Southern Pac. Transportation Co.* v. *State of California* (1981) 115 Cal.App.3d 116, 120-121 [171 Cal.Rptr. 187]; *Sorenson* v. *Allred, supra,* 112 Cal.App.3d at pp. 721-725.) As the *Zavala* court explained, "there no longer exists in California a need for the categorization of misconduct into degrees of negligence. A finding of wilful misconduct

previously operated to protect a plaintiff from the harsh doctrine of contributory negligence. With the abolition of that doctrine, the classification serves no purpose." (125 Cal.App.3d at p. 650.)

We hold therefore that unless the legislature expressly states to the contrary, plaintiff's contributory negligence should be assessed under comparative negligence principles in all cases where defendant's liability for negligence is predicated upon a violation of statute.[13] Therefore, it was error for the trial court to deny the Boals the benefit of an assessment of the plaintiff's contributory negligence in bringing about the accident which has shattered their lives.[14]

Since we conclude that the amount awarded to Sagadin cannot stand, we turn to his cross-appeal. We consider Sagadin's arguments in the unpublished portion of this opinion in order to assess whether we must order a new trial or can rescue the verdict from the confusion growing out of the consolidation of these cases. Sagadin's arguments may be classified in three categories: the verdict is a product of bias and prejudice on the part of the jury; the jury's assessment of percentages of liability was a product of reversible error; and the trial court committed reversible error in various instructions and related evidentiary rulings. He also contends that a nonsuit against him on a cause of action of fraud against Swift was erroneously granted. We do not find any of these sufficient, either individually or collectively, to reverse the judgment and order a new trial.[15]

III*

SAGADIN'S CROSS-APPEAL

. . . . . . . . . . . . . . . . . . . . . . . .

[13]The Legislature occasionally has expressly set forth the civil consequences of a violation of a penal statute. As we have seen, Civil Code section 1714, subdivision (c) now provides that no social host shall be civilly liable for furnishing alcoholic beverages to minors in violation of section 25658. In other instances, the Legislature has exempted the violation of a criminal statute from the statutory presumption under Evidence Code section 669. For example, Vehicle Code section 40831 provides: "In any civil action proof of speed in excess of any prima facie limit declared in Section 22352 at a particular time and place does not establish negligence as a matter of law but in all such actions it shall be necessary to establish as a fact that the operation of a vehicle at the excess speed constituted negligence."

[14]Contrary to counsel's fatuous suggestion, the Boals did not invite this error. Declining a stipulation *after* the close of evidence to argue only the contributory negligence of the passenger plaintiff (Schlauch) can hardly be said to waive the right to appeal the improper preclusion of the issue from the Boals' case.

[15]We reserve discussion on his settlement credits argument for part IV, *infra*.

*See footnote, *ante*, at page 1141.

## IV

### REVERSAL OR MODIFICATION

Having concluded that Sagadin's cross-appeal does not justify reversal, our way is clear to decide whether a new trial is necessary because of the erroneous contributory negligence ruling or if the verdict may be saved.[18]

■ Whenever an appellate court may make a final determination of the rights of the parties from the record on appeal, it may, in order to avoid subjecting the parties to any further delay or expense, modify the judgment and affirm it, rather than remand for a new determination. (*Fox* v. *Hale & Norcross S. M. Co.* (1898) 122 Cal. 219, 221-222 [54 P. 731]; *Sorenson* v. *Allred, supra,* 112 Cal.App.3d at p. 726.) The record is sufficiently definite in this case to do so because the comparative fault of all the parties was determined by the jury. "Certainly when explicit findings as to the comparative fault of multiple defendants have already been made in the trial court, as in the case at bar, it presents no undue burden to permit such findings to be utilized as a basis for the allocation of liability among the defendants." (*Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322, 334, fn. 6 [146 Cal.Rptr. 550, 579 P.2d 441].)

Before making that allocation, we must first deal with issues of settlement credits raised by the parties. The Boals claim they are entitled to credit for the settlements by Sagadin and Ripper (in their role as defendant in each other's suit) in proportion to the *fault* of Sagadin and Ripper, rather than the amount *paid.* Thus on the $1,250,500 Sagadin verdict, they claim they are entitled to credit based upon Ripper's percentage of fault (55 percent) or $687,775, rather than credit for the $15,000 Ripper actually paid Sagadin in settlement. ■ The argument asks us to disregard the statement in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] that "a plaintiff's recovery . . . should be diminished only by the amount . . . actually recovered . . ., rather than by an amount measured by . . . proportionate responsibility for the injury." (20 Cal.3d at p. 604.) As we have said in response to a similar request on another occasion, "[appellant] characterizes the foregoing language as dicta, and so it is. Nonetheless we decline his invitation to avoid its plain meaning." (*Jaramillo* v. *State of California* (1978) 81 Cal.App.3d 968, 971 [146 Cal.Rptr. 823].) We adhere to our position that this is compelling dicta.

---

[18]Having found the contributory negligence ruling to be error, the Boals' argument that they were improperly assessed the entire amount of plaintiffs' contributory negligence in the Sagadin and Ripper cases is mooted.

Sagadin in his protective cross-appeal claims that the trial court improperly applied the combined factors of contributory negligence and settlement credits to the damages as found by the jury. He, too, asks us to disregard clear precedent by *first* deducting the amount of settlement credits from the damages and *then* reducing the remaining amount by the percentage of contributory negligence. We decline the invitation, adhering to the straightforward holding of *Lemos* v. *Eichel* (1978) 83 Cal.App.3d 110, 118-119 [147 Cal.Rptr. 603]. A jury's assessment of the degree to which a plaintiff is at fault for his own injuries is entirely and explicitly removed from any consideration of the amount of settlements the plaintiff has received. Therefore, the settlement credit factor should not enter the equation until the damages have been apportioned among the parties in the amounts set by the jury.

At long last reaching the bottom line, we are provided a perfect vehicle in the record to serve as a basis for modifying the judgment. The jury itself in its special verdict assessed the percentages of fault of the parties in the Sagadin and Ripper actions. The error, simply enough, was in failing to give the Boals the benefit of these assessments. We will give the Boals that benefit by modifying the judgment to reflect the proportionate fault of Sagadin and Ripper. Thus the total damages of plaintiff Sagadin ($1,250,500) will be reduced 60 percent to reflect his contributory negligence as found by the jury, for a modified award of $500,200. From this figure, the settlements amounting to $334,913.33 are to be deducted, resulting in a net amount of $165,286.67 as the judgment against Swift, Toyota, and Robert and Bruce Boals.

The total damages of plaintiff Ripper ($528,000) will be reduced 55 percent to reflect his contributory negligence as found by the jury, for a resulting total of $237,000. From this figure, the settlements amounting to $334,913 are to be deducted, resulting in a net judgment in favor of Ripper of zero dollars.

V

INDEMNITY

Having resolved the merits of the main actions, we now turn to the squabble among the defendants (who include Messrs. Ripper and Sagadin in their roles as defendants in the three actions) over who is to foot the bill.

A

We first consider the cross-complaints by Toyota and Swift against the Boals for indemnification for the Schlauch settlement.[19] In settlement of the Schlauch's action, Toyota paid him $200,000 and Swift paid him $955,000. All parties stipulated that the court could consider all the evidence in the main cases and could further consider, but was not bound by, the findings of fault made by the jury in both the Sagadin and Ripper cases. No additional evidence was presented in the indemnity actions.[20] The court adopted the findings of fault from the Sagadin action and found Toyota and Swift each 15 percent at fault for Schlauch's injuries and the Boals collectively at 10 percent. Although implicit in that finding was that Sagadin was 60 percent at fault, the court nevertheless ruled that Toyota and Swift were entitled to recover from the Boals the entire amount of the settlements in excess of the fault of the settling party. Thus, it found the Boals owed Toyota $170,000 ($200,000 less 15 percent) and Swift $811,750 ($955,000 less 15 percent) for a total of $981,750.

Wisely abandoning an argument that the settling defendants had no right to seek indemnity, the Boals focus their energy on maintaining that it is not in keeping with the principles of *Li* and *American Motorcycle* for them to be held liable for a sum which far exceeds their percentage of fault. Toyota and Swift—also citing *Li* and *American Motorcycle*—claim this is the only fair and equitable procedure. They assert that precluding them from recovering the full amount of their payments (less only an amount of the payment reflecting their own percentage of fault) would thwart a hierarchy of public policy which gives primacy to encouraging settlements. (See *Hemmelgarn* v. *Boeing Co.* (1980) 106 Cal.App.3d 576, 588 [165 Cal.Rptr. 190].)

The equitable indemnity rule announced in *American Motorcycle* permits "a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." (20 Cal.3d at p. 598.) The equitable indemnity doctrine originated "in the common sense proposition that when two individuals are responsible for a loss, but one of the two is more culpable that the other, it is only fair that the more culpable party should bear a greater share of the loss." (*Id.*, at p. 593.) This right to indemnity is not extinguished because the tortfeasor settles with the plain-

---

[19]As we noted earlier, the Boals did not appeal from the judgment in favor of Schlauch. Consequently, all three of them, including Lillian, are precluded from denying their liability to him.

[20]The only finding concerning Schlauch's damages was that made by the jury when it rendered its verdict for $1,249,136 in his favor in the action against the Boals. Both the court and all the parties to the indemnity actions implicitly accepted that figure and no contrary contention concerning those damages is made here.

tiff and consequently "a settling concurrent tortfeasor may pursue his right of equitable partial indemnity against other concurrent tortfeasors." (*Sears, Roebuck & Co.* v. *International Harvester Co.* (1978) 82 Cal.App.3d 492, 497 [147 Cal.Rptr. 262]; *Bolamperti* v. *Larco Manufacturing* (1985) 164 Cal.App.3d 249 [210 Cal.Rptr. 155]; see also Code Civ. Proc., § 877.)[21] Since the right of partial equitable indemnity is limited to recovery on a comparative fault basis, as between cotortfeasors "each shall bear the loss in proportion to his fault." (*Parker* v. *Morton* (1981) 117 Cal.App.3d 751, 756 [173 Cal.Rptr. 197]; citations omitted.) But how is the loss to be apportioned when one or more of the tortfeasors is exempt from liability or is otherwise judgment proof? Here Sagadin, who was 60 percent at fault, was not subject to liability in the indemnity cross-actions by Toyota and Swift because, as we shall demonstrate, he had entered into a good faith settlement with Schlauch in the main action. ■ "[A] tortfeasor who has entered into a 'good faith' settlement . . . with the plaintiff must also be discharged from any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor." (*American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d at p. 604; see also Code Civ. Proc., § 877.6, subd. (c); *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159]; *Lyly & Sons Trucking Co.* v. *State of California* (1983) 147 Cal.App.3d 353, 356, fn. 1 [195 Cal.Rptr. 116].) Similarly Swift and Toyota, both 15 percent at fault, had also settled in good faith with Schlauch and consequently were immune from indemnity from each other and from the Boals.

■ The question then is how the shortfall caused by the settlement of one or more joint tortfeasor is to be shared by the remaining tortfeasors in an equitable indemnity proceeding. The trial court's answer was that the shortfall was to be borne entirely by the Boals. That answer was wrong. The issue is "how to divvy up in dollars the percentage of responsibility attributable to joint tortfeasors who have settled and thus are judgment proof." (*Lyly & Sons Trucking Co.* v. *State of California, supra,* 147

---

[21]Code of Civil Procedure section 877 provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—[¶] (a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is greater; and [¶] (b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

As the Supreme Court recently noted, "the language of section 877 is significant—its drafters did not use the narrow term 'joint tortfeasors,' they used the broad term 'tortfeasors claimed to be liable for the same tort.' This language was meant to eliminate the distinction between joint tortfeasors and concurrent or successive tortfeasors, and to permit broad application of the statute." (*Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 302 [216 Cal.Rptr. 443, 702 P.2d 601], citations omitted.)

Cal.App.3d at p. 355.) The correct answer is that "the sharing must be proportional to the remaining tortfeasors' degree of comparative fault." (*Ibid.*) Thus, "[t]he rule is that: (a) the solvent tortfeasors among themselves in an indemnity action must share in direct proportion to their respective degree of fault the liability of their judgment-proof coactors; and (b) this computation must be made as though the judgment-proof tortfeasors had not been involved in the accident." (*Id.*, at p. 358; see also, Fleming, *Report to the Joint Committee of the California Legislature on Tort Liability on the Problems Associated with American Motorcycle Association v. Superior Court* (1979) 30 Hastings L.J. 1465, 1491-1494.)

Thus in determining the correlative rights of the concurrent tortfeasors in the indemnity actions, the apportionment of plaintiff Schlauch's loss must be made as though the immune good faith settlors had not been involved in the accident. In Toyota's indemnity action against the Boals, both Sagadin (60 percent at fault) and Swift (15 percent at fault) are immune as good faith settlors. Thus, only 25 percent of fault remains to be apportioned on a ratio of 15 percent for Toyota and 10 percent for the Boals. Schlauch's loss was fixed by the jury at $1,249,136 and Toyota's share of that loss, on an adjusted basis, is 15/25 or 60 percent. Toyota's adjusted share then is $749,481.60. Since Toyota only paid $200,000 in settlement, it did not pay more than its proportionate share, as adjusted, and consequently has no indemnity rights against the Boals.

In Swift's indemnity suit against the Boals, both Sagadin and Toyota are immune and once again only 25 percent of fault remains to be apportioned. The ratio remains at 15/25 or 60 percent. Swift's adjusted share therefore is also $749,481.60. Since Swift paid $955,000 in settlement, it is entitled to recover the difference, $205,518.40, from the Boals.

Any adjustment of indemnity rights is inherently skewed when there are immune tortfeasors and this case reflects that distortion. Nonetheless, the imperfect adjustment here strikes a rough balance of the rights of the parties. Toyota recovers nothing in its indemnity suit but still pays less overall than the Boals even though more at fault. Toyota consequently reaps the benefits of a prudent settlement. Swift pays the most but that is a consequence of its disportionately high, and hence imprudent, settlement. Finally, the Boals pay more than their share of fault but that is the risk they assumed by not settling.

The Boals also complain that the trial court improperly awarded prejudgment interest to Toyota and Swift. The court ordered that prejudgment interest should run from the dates that Toyota and Swift made the settlement payments, December 22, 1980, and January 1, 1981, respectively. The

Boals argue that the court erred because the damages were neither certain nor capable of being made certain by calculation. Civil Code section 3287, subdivision (a) provides that "[e]very person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." Under this statute prejudgment interest may be recovered in tort actions where the damages are readily ascertainable. (*Levy-Zentner Co.* v. *Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 798 [142 Cal.Rptr. 1].) It follows then that prejudgment interest is also allowable under the statute in an indemnity action which arose out of a personal injury action when the damages are certain and ascertainable. (*E. L. White, Inc.* v. *City of Huntington Beach* (1982) 138 Cal.App.3d 366, 377 [187 Cal.Rptr. 879].) The question here is whether the damages were certain or ascertainable within the meaning of the statute. The total amounts of the settlement payments by Toyota and Swift of course were fixed by the sums paid and in that sense were certain. But the amount of the actual damages suffered by Schlauch remained uncertain until some factfinder determined them, either in the main action or in the indemnity action, as the case may be. At the time the settlement amounts were paid, it was not certain or ascertainable whether they would exceed, equal or be less than the amount of damages ultimately found by the trier of fact. Had Schlauch's damages been less than the amounts paid in settlement by the other tortfeasors, the Boals' proportionate share in the indemnity action would be limited to the lesser amount and not the higher settlement figure. Here, at the earliest, it was not until the jury rendered its verdict that the amount of Schlauch's damages was finally determined and hence made certain within the meaning of the statute. That fact distinguishes this case from *E.L. White, Inc.* v. *City of Huntington Beach, supra,* 138 Cal.App.3d 366. There a construction company was found liable in a wrongful death and personal injury case which arose out of a municipal construction site accident. After satisfying the judgments, the construction company and its insurer sued the city for total indemnity, claiming that the city was actually negligent while the company was only vicariously liable. Although the company and its insurer were awarded full indemnity, the trial court denied their request for prejudgment interest. The city claimed that the damages were not certain or ascertainable because they could not be determined until the court made its comparative fault findings in the indemnity action. The Court of Appeal rejected that contention and ordered the judgment modified to allow interest from the date the personal injury judgments were paid. The reviewing court held that the "claim for indemnity was certain in amount from the date the underlying judgments were satisfied, but were subject to a possible reduction if [the construction company] was found to have been more than vicariously liable. The possibility of that reduction, or even an actual reduction, does not render [the

company and its insurer's] damages any less certain." (*Id.*, at p. 378.) When the judgment was paid in that case, the amount of damages was fixed and only the apportionment was left to be determined. Here, in contrast, the damages were not fixed by the settlement payments. Damages remained uncertain because they could not be ascertained until fixed at trial. In short, damages for equitable indemnity purposes are not made certain when some, but not all, of the tortfeasors settle with plaintiff. Partial settlements do not fix damages.

"Subdivision (a) of section 3287 does not authorize prejudgment interest as a matter of law where the amount of damage, as opposed to only the determination of liability, depends upon a judicial determination based upon conflicting evidence . . . ." (*Esgro Central, Inc.* v. *General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1062 [98 Cal.Rptr. 153].) Since the amount of damage here depended upon the results of the contested trial, the lower court abused its discretion in awarding prejudgment interest.

## B

We now change our point of view to a perspective of the Boals as cross-complainants for indemnification from Toyota in the Schlauch case and from Ripper and Sagadin in all three cases. As we have recited, Toyota paid $200,000 to settle Schlauch's claim and Ripper and Sagadin each paid $15,000 to settle Schlauch's claim and paid $15,000 to each other to settle their reciprocal claims.[22] The trial judge held a hearing on the good faith nature of the settlements, found that they were all in good faith and dismissed the Boals' cross-complaints for indemnity. The Boals asserted below that these settlements were not made in good faith; the claim is renewed here.

With respect to Ripper and Sagadin, the trial court found that the fact that they settled at their policy limits, coupled with the absence of any evidence of collusion and supplemented by the evidence they had no other available assets at the time of the settlements, proved that the settlements were made in good faith. With respect to Toyota, the trial court found good faith based on the absence of any collusion (a point conceded even by the Boals' counsel) and testimony that the settlement exceeded the figure suggested by the judge to whom the case had been referred for settlement negotiations.

The numerous briefs before us on the question of good faith in these settlements have centered on the holding of *Dompeling* v. *Superior Court*

---

[22]The Boals concede that Swift's settlement of $955,000 to Schlauch was made in good faith and raise no issue on appeal concerning that settlement.

(1981) 117 Cal.App.3d 798 [173 Cal.Rptr. 38], which found no relevancy in the tortfeasor's theoretical proportional share of liability when compared with the amount of settlement. The Boals' argument for a different standard has found expression in *Tech-Bilt Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d 488. There the high court held that in determining the good faith of a settlement the trial court should consider, among other things, "whether the amount of the settlement is within a reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (*Id.,* at p. 499.) The court disapproved *Dompeling* and its progeny, to the extent that they are inconsistent with its opinion. Nevertheless, the Supreme Court reaffirmed that bad faith is not established merely by showing that a settling defendant paid less than his theoretical proportionate share. (*Ibid.*) ▮ Instead, "a number of factors [must] be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial condition and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants." (*Ibid.*)

Even under the *Tech-Bilt* formulation, the lower court's rulings in the present case must be upheld. Since *Tech-Bilt* merely adds to the list of factors to be considered by the trial judge, the factors actually considered by the lower court still constitute substantial evidence for its rulings. In addition, the undisputed facts show that a question of proportionality will not affect this case. With Toyota, the amount of the settlement was within the range of liability as found by the settlement judge and fairly approximated the actual liability established at trial (which does not enter our review of the decision, but simply goes to show that this was in fact a reasonable settlement). ▮ As for Ripper and Sagadin, it is true that the amounts in which they settled in no way reflects their culpability in the accident, and the fact of their settlement effectively concealed the truth as to who was actually driving that night. However, balanced against these considerations is the overriding fact that the trial judge found that the defendants were insolvent but for the insurance policies, a relevant factor. Given these factors, we cannot say that the trial court abused its discretion.

## VI

### Conclusion

In summation, we have found that the 1978 amendments were not retroactive, in accordance with the solid body of precedent. The jury was prop-

erly instructed on furnishing alcohol, and there was substantial evidence to support the finding that Robert and Bruce Boal furnished alcohol to the plaintiffs, and that this was a proximate cause of the accident. There was no evidence that Lillian Boal furnished alcohol and plaintiff's judgment against her must be reversed. Contributory negligence was improperly denied to the Boals for comparative fault purposes but we are able to assess the correct liability on appeal without need for a new trial.

On Sagadin's cross-appeal, there was no error in admission of evidence or in instructions such that he is entitled to a new trial. Finally, with respect to indemnity, the Boals were incorrectly assessed an amount greater than their proportionate share and were improperly charged with prejudgment interest. Both of these errors we are able to correct on appeal. Otherwise, the indemnity rulings were correct.

As modified in the disposition portion of this opinion, the judgments under review are affirmed.

### VII*

#### DISPOSITION

. . . . . . . . . . . . . . . . . . . . . . . .

Sims, J., concurred.

**REGAN, Acting P. J.**—I dissent. I believe the 1978 legislative amendments give defendants Robert, Lillian and Bruce Boal absolute immunity from any liability to plaintiffs premised on the Boals' "furnishing" of alcoholic beverages as social hosts. I believe this is so because the amendments apply retroactively to immunize social hosts from the kind of liability asserted in this case. In this regard, it is particularly the "social host" liability which is without effect at the time of the incident here, as I believe the doctrine defining this liability in *Coulter* v. *Superior Court* (1978) 21 Cal.3d 144 [145 Cal.Rptr. 534, 577 P.2d 669], was in fact stillborn. My explanation follows.

First, it is fundamental that a statute be interpreted to effectuate the legislative intent. (*Mannheim* v. *Superior Court* (1970) 3 Cal.3d 678, 686 [91 Cal.Rptr. 585, 478 P.2d 17].) Courts must look then for expressions of legislative intent. In order to determine what the legislative intent is, "all pertinent factors" must be considered. (*In re Estrada* (1965) 63 Cal.2d 740,

---

*See footnote, *ante,* at page 1141.

746 [48 Cal.Rptr. 172, 408 P.2d 948]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371].) Some of these factors are: (1) purposes of the legislation; (2) public policy; (3) history and background; (4) evils to be remedied; and (5) the express language of the statute. *(Bouquet, supra,* 16 Cal.3d at p. 587.)

"In determining the legislative intent, the court turns first to the words used in the statute. [Citations.] The words, however, must be read in context, keeping in mind the nature and obvious purpose of the statute where they appear [citations], and the statutory language applied must be given such interpretation as will promote rather than defeat the objective of the law [citations]." *(Pennisi* v. *Department of Fish & Game* (1979) 97 Cal.App.3d 268, 273 [158 Cal.Rptr. 683].)

While the instant legislation obviously does not use the word "retroactive," I note that both Business and Professions Code section 25602 and Civil Code section 1714 contain express language which could be construed as giving the legislation retroactive effect. Specifically, Civil Code section 1714 states: "It is the intent of the legislature to *abrogate* the holdings [of *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 164 (95 Cal.Rptr. 623, 486 P.2d 151) and its progeny] and to *reinstate* the prior judicial interpretation of this section . . . ." (Italics added.) Similarly, Business and Professions Code section 25602, subdivision (c), states "The Legislature hereby declares that this section shall be interpreted so that the holdings in [*Vesely* and its progeny] be abrogated in favor of *prior* judicial interpretation . . . ." (Italics added.) I interpret this language to mean two things. First, the Legislature *never* intended Business and Professions Code section 25602 to be used to create a duty to a class of persons, nor should the breach of such duty have been used as the basis for a presumption of negligence. Second, the Legislature never intended the court to modify the common law notion of proximate cause under which the consumption rather than the serving of alcohol was the proximate cause of injuries caused by intoxicated patrons.

If the Legislature never intended such liability in the first place, it is logically absurd to deny a retroactive application of the amendments. Courts must avoid an interpretation which attributes a logical absurdity to the legislation being construed. *(Dempsey* v. *Market Street Ry. Co.* (1943) 23 Cal.2d 110, 113 [142 P.2d 929].)

This interpretation means the Legislature is in effect telling us what its intent was when it first passed Business and Professions Code section 25602 and what its intent is now. Although the authority to interpret preexisting legislation is a power belonging exclusively to the judiciary *(Matter of Coburn* (1913) 165 Cal. 202, 209 [131 P. 352]), an express declaration by the

Legislature of what its intent *was* in an earlier enactment (through prior judicial interpretation) may be considered together with other factors in arriving at what the true intent of the Legislature is. (*People* v. *Childs* (1980) 112 Cal.App.3d 374, 389 [169 Cal.Rptr. 183].)

It is true that a plausible interpretation of the 1978 amendments might be that the Legislature initially intended Business and Professions Code section 25602 to be interpreted to establish civil liability and only later changed its collective mind in 1978 following the public outcry over *Vesely*. However, both the history surrounding that section and its express language lead me to conclude the Legislature never intended it to be used as a basis for civil liability, particularly *for social hosts*. I assume the mandate in Business and Professions Code section 25602 "that this section shall be interpreted so that the holdings in [*Vesely* and its progeny] be abrogated in favor of prior judicial interpretation . . . ." directs us to look at the common law as it existed under *Tammers* v. *Pacific Electric Ry.* (1921) 186 Cal. 379 [199 P. 523], *Hitson* v. *Dwyer* (1943) 61 Cal.App.2d 803 [143 P.2d 952]; *Fleckner* v. *Dionne* (1949) 94 Cal.App.2d 246 [210 P.2d 530], and *Cole* v. *Rush* (1955) 45 Cal.2d 345 [289 P.2d 450].[1]

In *Cole*, the California Supreme Court stated: "A number of jurisdictions have adopted statutes creating a right of action, . . . California, however, has enacted no such statute notwithstanding the fact that, as hereinafter shown, its Legislature has repeatedly dealt with problems concerning alcoholic beverages and concerning tort liability." (45 Cal.2d at pp. 348-349.) "[T]he Legislature . . . has at no time seen fit to adopt a statute inconsistent with the common law so far as concerns a remedy for injury or death following the furnishing of liquor . . . ." (*Id.*, at p. 355.)[2]

In addition, the fact that the Legislature could have reacted to the statutory interpretation contained in *Cole*, but didn't, indicates the *Cole* court correctly interpreted the legislative intent at that time. I view this legislative inaction as extrinsic evidence that the Legislature either never intended the Alcoholic Beverage Control Act to impose dram shop liability, or that it acquiesced in the *Cole* interpretation. ". . . [I]f the Legislature does not see

---

[1]For analyses of what constitutes the prior judicial interpretation, see generally Comment, *Civil Liability for Furnishing Liquor in California* (1974) 5 Pacific L.J. 186; Comment, *Social Host Liability for Furnishing Alcohol* (1979) 10 Pacific L.J. 95; *Liquor Law Liability in California* (1973) 14 Santa Clara Law. 46; *Dram Shop Liability* (1969) 57 Cal.L.Rev. 995.

[2]Although the court in *Cole* did not specifically consider the question of the defendant's alleged violations of the Alcoholic Beverage Control Act and instead prevented the plaintiff's recovery under common law notions of proximate cause, *Cole* contains broad language which indicates the Legislature did not intend the Alcoholic Beverage Control Act to be used as a basis for statutory dram shop liability.

fit to change the language of the statute, it must be presumed that the Legislature is aware of the judicial construction and by its failure to amend the section has approved the decision as a statement of legislative intent. [Citations omitted.]" (*People* v. *Strohl* (1976) 57 Cal.App.3d 347, 359-360 [129 Cal.Rptr. 224].)

By reinstating prior judicial interpretation and expressly eliminating social host liability for the furnishing of alcoholic beverages, the Legislature is telling us that it never intended Business and Professions Code section 25602 to be used to establish civil liability and that it is satisfied with the old law under *Cole*. I read this as an implicit, if not explicit, statement that the Legislature intends Business and Professions Code section 25602 and Civil Code section 1714 to be given retroactive effect.

Sagadin is not persuaded by this argument and queries if the Legislature went to such pains to express its intent, why did it fail to include an urgency clause in either Business and Professions Code section 25602 or Civil Code section 1714?

Article IV, section 1 of the California Constitution authorizes the Legislature to pass urgency legislation or emergency legislation on a two-thirds vote, following a finding that the legislation is necessary for the " 'immediate preservation of the public peace, health or safety . . . .' " (*Davis* v. *County of Los Angeles* (1938) 12 Cal.2d 412, 418 [84 P.2d 1034].) Any law passed by the Legislature which is deemed an urgency measure will go into immediate effect.

However, given that the authority for urgency legislation is dependent on finding the legislation is necessary for the "immediate preservation of the public peace, health and safety" (*ibid.*), I find the absence of an urgency clause to be less than significant. Amending civil procedure to immunize social hosts from civil liability is not per se a question of public peace, health or safety, except perhaps inasmuch as it supports the welfare of trial attorneys.

In light of the fact the Legislature (1) may have been operating under the assumption the language of the legislation implicitly contained expressions of intent to apply retroactively, and (2) is aware that "urgency" clauses are only used in cases where the legislation is necessary for the preservation of public peace, health and safety, I am unable to conclude the absence of an urgency clause is controlling.

Since *Marriage of Bouquet* directs us to "impute weight to expressions of intent in accord with their probative value" (16 Cal.3d at p. 590), I give

greater weight to the express language "reinstate prior judicial interpretation" contained in Civil Code section 1714 as evidence the Legislature intended Business and Professions Code section 25602 and Civil Code section 1714 to apply retroactively.

Furthermore, as I noted at the outset, *Bouquet* requires us to look at *"all* pertinent factors" (italics added) which may aid in ascertaining the legislative intent. Therefore, I turn to the "public policy" behind the amendments. (*Id.*, at p. 587.) "Public policy considerations include the purpose to be served by the new rule, and the effect on the administration of justice of retroactive application." (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 153 [181 Cal.Rptr. 784, 642 P.2d 1305], citing *Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967].)

As I noted earlier, the express intent of the Legislature is to "reinstate prior judicial interpretation." (Civ. Code, § 1714.) If we reinstate prior judicial interpretation and apply it prospectively (i.e., only to causes of action arising after Jan. 1, 1979), we create an anomaly. A statutory cause of action which arose on December 31, 1978, would be decided under *Vesely, supra,* 5 Cal.3d 153 and *Coulter, supra,* 21 Cal.3d 144, while an identical cause of action which arose on January 1, 1979, would be decided under the 1978 legislation. It would be logically absurd to establish an 8-month "window," within which social hosts face liability for injuries to third persons, some of whom conceivably may wait until they have reached their majority to pursue a cause of action against such hosts, stemming from an 8-month "window" years before.[3]

As I see it, the purpose of the legislation is to provide a broad immunity to social hosts from suits arising as a result of injuries caused by intoxicated guests. A similarly sweeping immunity is granted to licensed servers under Business and Professions Code section 25602, with one narrow exception pertaining to "obviously intoxicated minor[s]." (See *Cory* v. *Shierloh* (1981) 29 Cal.3d 430, 436 [174 Cal.Rptr. 500, 629 P.2d 8].)

However, this case does not involve the effect of the entire *Vesely* line of decisions, but only the doctrine set forth in *Coulter* v. *Superior Court, supra,* 21 Cal.3d 144, namely "social host" liability. *Coulter* was, as I view it, stillborn. While Sagadin argues the Legislature may have silently "approved" of the *Vesely* line of decisions, and later changed its mind, certainly the Legislature could not have "approved" of *Coulter* so.

---

[3]It would be equally illogical to assert that liability based on *Coulter* could extend retroactively before the date of decision in *Coulter,* especially in light of the 1978 legislative amendments abrogating *Coulter* and reinstating *prior* judicial interpretation, i.e., such as existed before the date of decision in *Coulter.*

Indeed, the 1978 legislation was originally introduced as Senate Bill No. 1645 on March 2, 1978, expressly abrogating only *Vesely* and *Bernhard.* The California Supreme Court decided *Coulter* v. *Superior Court, supra,* 21 Cal.3d 144, definitively establishing social host liability, in an opinion filed April 26, 1978. By May 17, Senate Bill No. 1645 was amended in the Senate to add *Coulter* to the list of cases to be abrogated, with additional provisions to immunize "social hosts." Senate Bill No. 1645 was passed by the Senate on May 24, as amended, passed by the Assembly on August 28, and approved by the Governor on September 19. (1978 Stats., ch. 929, § 2, p. 2904; Sen. Final Hist. (1977-1978 Reg. Sess.) p. 895; Sen. Amend. to Sen. Bill No. 1645 (1977-1978 Reg. Sess.) May 17, 1978.) In the eyes of the public, *Coulter* had a shelf life of 147 days from the time of the decision to the signing of the bill abrogating it by name, and only 22 days from the time of the decision to its inclusion in the bill expressly abrogating it. In my eyes, this constitutes clear and convincing evidence the Legislature did not intend ever to give effect to *Coulter,* and that it never intended to provide for such liability through the statutory scheme. Insofar as I cited *People* v. *Strohl, supra,* 57 Cal.App.3d 347, for the proposition that the Legislature "approved" of the *Cole* interpretation (i.e., "by [the Legislature's] failure to amend the section, [it] has approved the decision as a statement of its legislative intent") clearly, here, the reverse corollary pertains: the Legislature wasted no time in abrogating *Coulter.*

The majority points to the decision in *Fosgate* v. *Gonzales* (1980) 107 Cal.App.3d 951 [166 Cal.Rptr. 233], to support its conclusion the 1978 legislation operated prospectively only. While I disagree with the holding in *Fosgate* in any case, I think it is distinguishable from the instant case. I read *Fosgate* as holding that the repeal of a statutory remedy without a savings clause will terminate all pending *statutory* causes of action (*id.,* at p. 960), but will not terminate pending *common law* causes of action. (*Id.,* at pp. 960-961.) Since *Fosgate* was an appeal from a judgment on the pleadings, all the plaintiff had to prove was whether on the face of the pleading under attack she sufficiently states a cause of action. Fosgate pled a common law cause of action in addition to a claim relying on Business and Professions Code section 25602 and Evidence Code section 669. Thus, by relying on her common law cause of action, Fosgate could avoid a judgment on the pleadings regardless of whether the repeal rule in *Southern Service Co.* v. *Los Angeles* (1940) 15 Cal.2d 1, 11 [97 P.2d 963] and *Governing Board* v. *Mann* (1977) 18 Cal.3d 819, 829 [135 Cal.Rptr. 526, 558 P.2d 1] applied.

Because Sagadin's cause of action is based solely on Business and Professions Code section 25658 and Evidence Code section 669,[4] the distinction

---

[4]Evidence Code section 669 provides in part: "(a) The failure of a person to exercise due

in *Fosgate* between statutory and common law causes of action is inapposite. Since I view Civil Code section 1714, subdivision (c), as a repeal of the civil remedies which were previously available under either Business and Professions Code sections 25602 or 25658 and Evidence Code section 669, the repeal rule in *Southern Service Co., Ltd.* v. *Los Angeles, supra,* at page 11 has the effect of cutting off Sagadin's pending cause of action based on Business and Professions Code section 25658.

Finally, I turn to Sagadin's argument that the Legislature may not validly repeal statutory remedies when to do so would deprive a person of a vested right or impair the obligation of contract. "Where a statute operates immediately to cut off an existing remedy and by retroactive application deprives a person of a vested right, it is ordinarily invalid because it conflicts with the due process clause of the federal and state constitutions. [Citations omitted.]" (*California Emp. etc. Com.* v. *Payne* (1947) 31 Cal.2d 210, 215 [187 P.2d 702].)

However, it is equally well-settled that when a pending cause of action is founded on a statute, a repeal of the statute before final judgment destroys the right of action. (*People* v. *Bank of San Luis Obispo* (1910) 159 Cal. 65, 77-78 [112 P. 866].) This must apply equally when there is an annulment of the rights based on a statute. Rights of action which are derived from a statute are inchoate until perfected by a final judgment. (*Id.,* pp. 77-78; *Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 170 [74 P.2d 252]; *People* v. *One 1953 Buick* (1962) 57 Cal.2d 358, 365 [19 Cal.Rptr. 488, 369 P.2d 16].)

Sagadin's right to a statutory cause of action under Business and Professions Code section 25628 was inchoate because it had not been reduced to a final judgment prior to the 1978 amendments. Therefore, he cannot claim the application of the 1978 amendments to his pending cause of action cut off any vested rights.

I would reverse the judgment against the Boals.

Petitions for a rehearing were denied January 9, 1986, and the petitions of appellant Sagadin, respondents Ripper and Chuck Swift Dodge-Chrysler for review by the Supreme Court were denied March 19, 1986.

---

care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."